COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| LIGHTSEY NATHAN SAUL, JR., | § | No. 08-12-00030-CR |
| Appellant, | § | Appeal from the |
| v. | § | 83rd District Court |
| THE STATE OF TEXAS, | § | of Pecos County, Texas |
| Appellee. | § | (TC# 2849) |
| | § | |

# **O P I N I O N**

Appellant Lightsey Nathan Saul, Jr., appeals his conviction for soliciting the capital murder of Joe Daggett, contending both that the trial evidence was legally insufficient to convict him of that crime, and that a purportedly tactical twenty-one-year delay in prosecution substantially prejudiced his right to a fair trial.

After reviewing Appellant's points of error, we find that the evidence is sufficient to support the judgment and that his due process rights were not deliberately prejudiced in this case. We affirm.

## **BACKGROUND**
### **FACTUAL HISTORY**

### *The Disappearance of Joe Daggett*

On Tuesday, March 1, 1988, at about 10:45 p.m., Joseph Wayne Daggett left his

girlfriend Sheridan Porter's house to go back to his own home on the Slaughter Ranch outside of Fort Stockton, Texas. He told Porter that he had planned to travel to a Chevrolet dealership in Odessa the next day to have repairs made to his new truck. At trial, Porter, who divorced Appellant in 1987, testified that Daggett did not call her when he got home that evening, which was unusual. He also failed to call her that Wednesday morning, even though the couple would usually speak on the telephone first thing in the morning. She called Daggett later that day at his ranch house but was unable to reach him, leaving a message on his answering machine. By Thursday morning, Daggett had still not contacted Porter. She called the Chevrolet dealership in Odessa, and the staff confirmed that Daggett had never come in for his truck repairs.

Porter and Daggett's grandmother then began searching Slaughter Ranch but found no sign of Daggett or his truck. Porter and Daggett's grandmother then entered Daggett's house, which Porter and her ex-husband, Appellant, had occupied prior to Daggett's occupancy. According to Porter, Daggett's boots, belt, money clip, shaving bag, and duffle bag were all missing from the ranch house. Daggett did not leave a note explaining where he went, and he also failed to make any entries into his daily ranch logs. After calling people listed in Daggett's address book to find out if anyone had seen him, Porter then called the Pecos County Sheriff's Department and reported Daggett missing. A few days later, authorities located Daggett's truck in the long-term parking terminal at the Midland Airport in Ector County. The truck was unlocked and had recently been washed.

As of the start of trial in October 2011, twenty-three years after his disappearance, Daggett's whereabouts were still unknown. A private investigator's search efforts in public information databases revealed the existence of a Houston post office box registered to a "Joe Daggett" in 1990. Tracy Pasqua, a high school friend of Daggett's, testified that near that same

2

time period, he saw someone who he thought looked like Daggett for a moment or two at a crowded livestock show in the Houston area they used to frequent when they would chaperone students from the Future Farmers of America program on school trips. However, the private investigator admitted the listing could be erroneous, given that the Houston P.O. Box is also listed as belonging to several other individuals during the same time period. He also acknowledged the number from the Houston P.O. Box exactly matched the Box number of Daggett's Fort Stockton P.O. Box. Daggett had no recorded credit activity nor had his Social Security number been used since his disappearance on March 1, 1988. Daggett's family has since had him legally declared dead. Despite numerous, extensive search efforts spanning decades, neither Daggett nor his body had ever been uncovered.

### 1988: The Initial Investigation

Three nights before Daggett's disappearance, Fort Stockton resident Barbara Penn placed a phone call to Pecos County Sherriff Deputy Sam Esparza. Penn explained that Jay, her husband, had told her Appellant had requested her husband's help with a plan to kill Joe Daggett. At trial, Barbara Penn testified that she had been "blown away" by what her husband told her, and she began eavesdropping on her husband's telephone calls with Appellant without her husband's knowledge. Based on what she heard in the conversations, she believed Appellant was serious and that a murder was going to take place. So, on February 28, 1988, she told Deputy Esparza, who she had known socially for many years, what she had overheard.

At the time, Esparza was on suspension pending the outcome of an investigation into his use of deadly force in a high-speed chase. Esparza explained at trial that the Pecos County sheriff's policy at the time was to suspend officers involved in deadly force cases until a grand jury either indicted or no-billed the officer. Esparza was still suspended when Barbara Penn

3

called him, so he could not personally investigate her tip without violating the terms of his suspension. He called then-sheriff Bruce Wilson that night, but was unsuccessful in reaching him. The next day, February 29, prior to attending his grand jury hearing, Esparza called then-Chief Deputy Sheriff Cliff Harris and informed him that he had received information that Joe Daggett's life was in danger. Later that day, the grand jury no-billed Esparza in the deadly force case and Esparza was re-instated. However, Esparza had two off-days after being reinstated, and did not resume his duties until March 4. He attempted to call Barbara Penn twice during his days off, but could not reach her.

On the evening of March 3, Harris informed Esparza that the sheriff's department had received a missing person report on Joe Daggett and that Esparza needed to come to work the next day. On March 4, Esparza called Barbara Penn and told her Daggett was missing. Esparza then asked Penn to confirm what she had overheard, that is, Daggett's truck was supposed to be parked at the Midland Airport as part of the murder plan. Penn told Esparza that was what she remembered hearing. Esparza then relayed this information to the Midland County Sheriff's Department. Deputies found Daggett's truck at the Midland airport in long-term parking several hours later. The truck had been recently cleaned. That same day, March 4, Esparza also interviewed Jay Penn and took Penn's handwritten statement.

At trial, Jay Penn, an electrician, testified that he had known Appellant since they were coworkers at a previous job. Penn stated Appellant had once asked him to come by Appellant's house at Slaughter Ranch to fix either a welder or a generator, while Appellant was still married to Sheridan Porter. In mid-February 1988, Appellant called Penn and asked him for "a favor," so Penn stopped by Appellant's new house off the Imperial Highway in Fort Stockton, thinking that Appellant had another electrical issue. Instead, Appellant said that he had been having problems

4

with a man named Joe Daggett, who had moved in with Appellant's ex-wife, Sheridan Porter. Appellant accused Porter of abusing their son and maintained that Daggett was selling drugs around his son. Penn told Appellant that if he believed his son was being abused, he should report it to child protective services. Appellant said that he had already reported Porter and nothing had come of it. Appellant then stated that he wanted to kill Joe Daggett. Appellant told Penn that when he moved off Slaughter Ranch, Appellant had kept a key to the ranch house where Daggett was now residing. According to Penn's trial testimony:

> [Appellant] said, What I need you to do, he says, I am going to kill Joe Daggett. And he said, What I need you to do is drop me off at his ranch. And then what he was going to do, the best I can remember, is that his – his plan was to have me drop him off at the Slaughter Ranch, which is the one by the Grey Ranch Plant. And then he was going to go into his house and make it look like he had shaved and was in a big hurry to – to leave and get out of town. He told me that Mr. Daggett had been known for just jumping up and leaving and taking trips and not letting anybody know where he was going. And then he says when Joe Daggett came in from working his cattle that afternoon or evening, whatever it was, that that's when he was going to kill him. And then he was going to take his body in his – in Joe Daggett's pickup, because I was supposed to drop him off, that he was going to take Joe Daggett's body, take it to a grave that he had already dug up on the Buena Vista Road or Texas Gulf Road. And then he was going to go from there and take the pickup after he dropped the body in the grave and covered it, whatever he was going to do, then he was going to go to the Midland Airport, drop his truck off at the airport so they would think that Joe Daggett had just decided to catch a plane and take off.

Jay Penn testified that he did not take Appellant's plan seriously, calling it "outlandish" and saying that it did not make any sense to him. He told Appellant that killing Daggett would keep Appellant from seeing his son, and he recommended that Appellant contact a lawyer to address custody issues he may have with Sheridan. Penn offered to help Appellant find an attorney. Penn then left Appellant's house and told Barbara, his wife, what had happened. After the meeting in which Appellant discussed killing Daggett with Penn, Appellant called Penn several times, asking if Penn had talked to an attorney yet. Penn then took a trip to Snyder,

5

Texas, for work. When he returned, Deputy Esparza approached him for questioning. As part of the investigation, the sheriff's department asked Penn to wear a wire and speak with Appellant, but the recording was not usable and the tape was never returned after being sent to the FBI for enhancement.

At trial, Sheriff Cliff Harris testified that he also participated in the Daggett investigation early on, but eventually shifted into a supervisory role. On March 10, 1988, Harris interviewed Burt Claver. Claver's deposition testimony was played for the jury at trial. In his deposition, Claver stated that he was an amateur gunsmith who made minor repairs to guns as a hobby. Shortly after Daggett disappeared but before the local newspaper carried the story, Appellant approached Claver and asked him if he could switch out the barrel on a Winchester .22 caliber rifle. Claver testified he told Appellant that he did not know how to switch out the barrel on the rifle and that he "didn't want anything to do with it." Claver was generally aware that Appellant and Daggett had problems.

At a pretrial hearing, Deputy Esparza testified that after his initial investigation he presented the Daggett case to J.M. Johnson, then-District Attorney for the 83rd District, and to Johnson's assistant Albert Valadez for prosecution. Valadez succeeded Johnson as 83rd District Attorney in 1991. According to Esparza, both men refused to prosecute the Daggett case without a body. Deputy Esparza continued to investigate leads on the Daggett case even after leaving the Pecos County Sheriff's Office and going to work for the Fort Stockton Police Department. However, without a body, the Daggett case eventually went cold.

### 1999: New Blood Evidence from Daggett's Truck

Texas Ranger Gerald Villalobos inherited the Daggett case from the Pecos County Sheriff's Department. In 1999, nearly eleven years after Daggett's disappearance, Ranger

Villalobos decided to order a previously-unperformed DNA test on some cover-alls and a bloody rock found on the floorboard of Daggett's truck. The cover-alls had no useable evidence, but the rock had testable blood. Villalobos did not have a reference sample of Daggett's DNA, so he collected DNA samples from Daggett's father, Merrill, and Daggett's mother Jean Paidousis. A private forensic lab ran a paternity-type test on the blood found on the rock. The test confirmed that the blood on the rock came from a person whose father was Merrill Daggett and whose mother was Jean Paidousis. Daggett and Paidousis only had two children: Joe and Joe's full-brother Bud. Bud's blood was collected on August 17, 1999, and sent to the DPS crime lab. The crime lab confirmed that the blood on the rock did not come from Bud Daggett. Based on DNA testing results, Ranger Villalobos deduced that the blood on the rock had come from Joe Daggett. The original bloody rock was never returned to Villalobos.

Villalobos testified at trial that as part of the DNA testing process, he traveled to Carlsbad, New Mexico, to execute a search warrant to obtain a DNA sample from Appellant. Villalobos stated that either during the ride to the hospital or at the hospital for the blood draw, Appellant made two statements of interest. First, when Villalobos commented that Daggett's truck had been cleaned and washed when police found it in Midland, Appellant said that it had rained the night that Daggett disappeared and that might explain why the truck was clean. Second, Appellant asked Villalobos what would happen if someone had killed Daggett by accident. When Villalobos pressed for more details, Appellant refused to make any further statements.

After obtaining the DNA results, Ranger Villalobos met with District Attorney Albert Valadez about prosecuting Appellant. According to Villalobos, Valadez convened an investigative grand jury but ultimately decided not to press forward with the case, believing that

7

without Daggett's body, there was not enough evidence to secure a conviction. Instead, Villalobos claims, Valadez decided to wait and see if more evidence would emerge that would help the case.

In 2004, Ranger Villalobos left Fort Stockton, and Ranger Brian Burzynski succeeded him as Texas Ranger for the Fort Stockton area.

### *2007: Fred Beck Relays Appellant's Alleged Confession to Investigators*

After living in Dell City, Texas, for a number of years, Appellant eventually leased a ranch outside of Jal, New Mexico. He became embroiled in a dispute over cattle grazing rights with his landlord Jim Keller, and after Keller tried to get Appellant to leave the property, Appellant sued Keller in 2007. In connection with that lawsuit, Keller hired private investigator James Juliano in order to learn more about Appellant. Keller also offered Appellant's second wife Diane $25,000 so that she could pay attorney's fees related to her then-pending divorce action against Appellant.

After Appellant and Diane had an "incident," Diane and Appellant's cousin Fred Beck spoke over telephone. Beck testified that he encouraged Diane to reach out to someone she trusted about what had happened between her and Appellant. Beck then told her that in spring 1991, Appellant had confessed to him that he had killed a man.

Shortly after that phone call, in October 2007, Keller traveled from Kansas to Fort Stockton for a meeting with Ranger Burzynski. At the meeting, Keller told Ranger Burzynski that Beck had some information related to the Daggett case. Ranger Burzynski then traveled to Albuquerque, New Mexico, with Pecos County Sheriff Cliff Harris to meet with and interview Beck. Beck gave a formal statement.

Beck told Ranger Burzynski that in spring 1991, almost three years after Daggett's

8

disappearance, Beck and his then-girlfriend stopped to visit Appellant and Diane at Appellant's ranch in Dell City. Fred and Appellant left the house to go pick up molasses for Appellant's cattle while the women remained at home. While in Appellant's truck, Fred and Appellant began discussing a flood that had happened in a salt flat outside of Dell City several years earlier. Appellant then remarked that rain had been "a significant element in an incident in the Fort Stockton area that L. N. was involved in."

According to Beck, over the next few hours, Appellant pieced out details about the "incident" he was involved in, eventually revealing that he had shot a "drug dealer" who "had threatened his son." At trial, Beck testified that Appellant told him that Appellant had entered his former house, where the man was living, using a key he had kept after moving out that house. Appellant retrieved a sleeping bag, went outside behind a corner of the house, and waited until the man returned home late at night. Appellant then surprised the man, shot him in the chest, "put the guy's body in the sleeping bag, put it in the pickup that belonged to the – the guy he had just shot, had already dug a hole for him, put him in the hole, took the pickup to Midland to the airport where he left it wiped clean," and was picked up from the airport by a good friend. Beck later told his father what Appellant had confessed to him, but ultimately decided to keep what he learned to himself until Diane called him after the "incident" in 2007. At trial, Beck denied ever having met Jim Keller.

After Beck gave his statement to law enforcement, he was approached by James Juliano, Keller's private investigator. At Juliano's behest, Beck ultimately agreed to surreptitiously audio record two conversations with Appellant. In the first recording, Beck called Appellant on the telephone, and Appellant began discussing the ongoing land dispute he had with his landlord. Beck then asked what Appellant thought about "all the publicity with that thing in Fort

9

Stockton." Appellant said he thought it was "crap" and accused his wife of conspiring with his landlord to stir up issues. Beck then made a remark about "the guy" who was supposedly killed in Fort Stockton showing up at an agriculture show in San Antonio, and Appellant explained that he had heard the "ag teacher" in Fort Stockton who had known the man saw him and yelled at him, but never found him. Beck then told Appellant he had heard investigators found new evidence, and Appellant stated, "it's Diane. It's got to be." Appellant also told Beck that before he married Diane, he "told her about the whole mess, just so that it wouldn't be a surprise later on if anything came up." Later, during the phone call, Beck asked Appellant, "did you ever tell anybody else that same story you told me in Dell City about having done that?" Saul paused, then answered "no." When Beck asked, "on this thing in Fort Stockton, you don't suppose by chance they've got anything on you or would you be concerned that they might have?" Saul replied that they had been trying to "pin" it on him but that the sheriff had told one of Appellant's friends that they never had anything on him. Saul also said that he was not worried, because the man was seen alive.

In the second recording, Appellant agreed to meet Beck in-person at a fast food restaurant in Eunice, New Mexico. Juliano accompanied Beck to the meeting, but drove to Eunice in a second vehicle and stayed in his car nearby while Beck and Appellant met. In the Eunice recording, Beck told Appellant that he was still bothered about "this deal down there in Fort Stockton." Appellant told him not to worry, because "they've got nothing" and "it'll never be brought up again." Beck then stated, "I wish you'd never told me." Saul replied, "don't ever say nothing over the phone ever again. That day you called me, you said something over the phone about it."

Meanwhile, armed with the new evidence from Beck, Ranger Burzynski approached

10

then-District Attorney Frank Brown about prosecuting the Daggett case. Burzynski testified that like his predecessors, Brown did not want to proceed with the prosecution without a body. Brown later recused himself from the Daggett case, citing a conflict of interest. Ranger Burzynski then met with prosecutors from the Texas Attorney General's Office's Criminal Prosecution Division, who agreed to take the case to trial.

**PROCEDURAL HISTORY**
*Indictment*

A grand jury returned an indictment against Appellant for solicitation of capital murder on May 14, 2009.

Count One of the Indictment[1] alleged that on or about February 19, 1988:

> LIGHTSEY NATHAN SAUL, JR. did then and there, with intent that capital murder, a capital felony be committed, request, command, or attempt to induce James Burl Penn to engage in specific conduct, to-wit: to transport said Defendant to Joseph Wayne Daggett's residence knowing that said Defendant intended to murder Joseph Wayne Daggett and subsequently take Joseph Wayne Daggett's vehicle, that under the circumstances surrounding the conduct of James Burl Penn, as the Defendant believed them to be, would have made James Burl Penn a party to the commission of capital murder[.]

*Hearing on Pre-Indictment Delay*

On July 11, 2011, Appellant filed a motion to dismiss for pre-indictment delay, arguing that the twenty-one year delay between Daggett's disappearance and the indictment in this case violated Appellant's procedural due process rights. Following a hearing, the trial court denied Appellant's motion.

*Trial*
**The State's Case**

In addition to the testimony detailed above, the State presented testimony from Laura Jones, who said that Appellant had made various threats against Daggett. The State also called

---

[1] Counts Two and Three were abandoned pretrial.

11

Weldon Blackwelder, who had been Appellant's roommate during their college years at Sul Ross University in Alpine. Blackwelder testified that when Appellant was 19, he talked about how there could not be a conviction for murder if police did not have a body, and he also talked about being able to find places to hide a body, but he never said where. Blackwelder and Appellant had a falling out during college that culminated in a physical fight. Blackwelder testified that on February 24, 1988, Appellant flagged him down on the interstate. Blackwelder thought it was odd because he and Appellant had not recently spoken except for greeting each other once or twice. Appellant told Blackwelder that he was trying to build a case against ex-wife, Porter, in their divorce, and he wanted to know if Porter had ever talked to Blackwelder's wife. Blackwelder testified that Appellant never used Porter's name, but instead referred to her as either "whore" or "bitch." Appellant also told him that he believed his son was in a bad environment, and commented that although Porter and Daggett were telling people they were only friends, Daggett would not leave her house until early in the morning. Blackwelder further testified that he thought about calling the sheriff, but ultimately decided not to, though he believed that Daggett at that point would have been justified in fearing for his life.

### The Defense's Case

The defense's case centered around discrediting State witnesses, establishing a partial alibi for Appellant for the late evening and early morning of March 1 and 2, 1988, and attempting to link Daggett to the drug trade in Fort Stockton in the 1980's.

The defense called Robert Ezell to the stand, but he invoked his Fifth Amendment rights and did not testify. Thereafter, the defense read portions of previous testimony he gave before a grand jury pursuant to an immunity agreement. Ezell testified he knew both Appellant and Daggett. Ezell further testified that on March 1, 1988, he was at Appellant's house from 5 p.m.

12

to 6:30 p.m. helping Appellant set up a VCR. Then he went to the high school weight room and talked to his friend Larry Garcia. Ezell did not deny the possibility that he had told Garcia he was going to kill someone, but he maintained that if he said it, he was not serious and was most likely talking about someone he had gotten into a fight with a few days earlier. After leaving the high school weight room, he went back to Appellant's house and stayed there from 7:45 p.m. to 8:30 or 8:45 p.m. Ezell then took a woman named Dymphna De La Rosa to a bar known as the Crossroads Bar. Ezell testified that he left the bar twice that night: once to pick up beer from Cal's store, which was about a ten minute drive, and once to take a man nicknamed "Peanuts" to Billy's Lounge, which was about another ten minute drive away. At about 1:45 or 2 a.m., Ezell left the bar with De La Rosa and another woman who worked at Crossroads Bar. He then drove to Appellant's house and arrived there at 2:30 a.m. Ezell testified that Appellant was asleep in his house and that he stopped by Appellant's house at 2:30 a.m. in the morning because he wanted to play a practical joke on him by waking him up because "payback is hell." A few days later, Ezell moved to Louisiana for work.

Donna Saul, Appellant's aunt, testified that on March 1, 1988, she saw Saul at his house around 6:30 p.m. Ezell was at the house with Appellant fixing a VCR. After Ezell left, she and Appellant talked for an hour or two, then watched a movie that finished at around 10 p.m. She tried to leave for her house at 10:15, but the lights on her truck went out. Appellant repaired the lights, and she finally left Appellant's house at about 10:25 or 10:30 p.m.

Dymphna De La Rosa, the woman who went with Ezell to Crossroads Bar, testified that she saw Ezell talking to Peanut at the bar while she played pool. At some point in the evening, Ezell said he was going to take Peanut some place, but that he would be back. De La Rosa stated that Ezell was gone for about forty-five minutes. Ezell returned, but then left the bar again for

13

another forty-five minutes. When Ezell returned the second time, De La Rosa asked him what had happened. De La Rosa testified that Ezell told her he went "to take care of some business." She then said, "[i]f it's business at this time, it must not be very good business." According to De La Rosa, Ezell agreed with her.

The defense also presented evidence related to drug activity in the Fort Stockton area during the late 1980s, and attempted to link Daggett to that activity. Victor Sarabia, a car wash attendant, testified that he knew Daggett because he came in on a regular basis to wash his truck. According to Sarabia, Daggett showed up at the car wash on March 1, 1988 at 8 a.m. with a man who did not speak English well. Sarabia said that the man with Dagget spoke "kind of like Spanish," but that it was not the type of Spanish he was used to and that it did not sound like Spanish from Mexico. Sarabia testified that Daggett looked nervous, like he was in a hurry, and he and the other man left in the pick-up truck together. Sarabia said that he talked to Deputy Esparza after this incident, but that Esparza never took a formal statement.

Chase Saul, the son of Appellant and Sheridan Porter, testified that he turned eight years old on February 29, 1988, the day before Daggett disappeared, and that Daggett had spent the evening with him and his mother at her house. Chase said that Daggett was gone a lot, and that he did not always know where Daggett was going. According to Chase, one time he was riding in Daggett's truck, Daggett stopped abruptly, and a bag of grayish white powder slid out from under the seat. Chase reached down to pick it up, but Daggett grabbed his arm and told him that he better not tell anybody what he saw or he would hurt Chase. Chase further testified that after Daggett disappeared, he was going through a safe in his mother's closet when he found some letters with an address from Colombia. He did not read the letters. Chase admitted that as an adult, he was very close with his father, but that he did not really have a relationship with his

14

mother.

The defense also presented testimony aimed at showing that Keller and Juliano were offering money and rewards for information. Specifically, the defense called Chrystal Richardson, Chase Saul's ex-wife, who testified that a private investigator had come to her and told her there was a lot of money in it for her to talk to him.

During closing arguments, the State and the defense respectively put on a rebuttal and a surrebuttal case aimed at bolstering their own witnesses' credibility and impeaching hostile witnesses with other witnesses.

**Verdict**

Appellant was convicted of solicitation of capital murder and sentenced to sixty years in prison. This appeal followed.

**DISCUSSION**

In two issues, Appellant challenges the legal sufficiency of the trial evidence supporting the underlying robbery of the capital murder solicitation and the constitutionality of the prosecution's decision to indict him for this offense more than two decades after Daggett's disappearance. We address each issue in turn.

**I.**
**A.**
**LEGAL SUFFICIENCY: SOLICITATION OF CAPITAL MURDER**

In Issue One, Appellant contends the evidence is legally insufficient to support his conviction for solicitation of capital murder because there is no evidence that he solicited Daggett's murder in the course of committing a robbery. Appellant advances a simple legal sufficiency argument in his brief: the jury verdict for solicitation of capital murder cannot stand because there is no evidence he wanted to kill Daggett in order to steal Daggett's truck.

15

Appellant notes that the State's theory, which he concedes is supported by the evidence, is that he planned to take Daggett's truck after murdering Daggett. Appellant argues the State failed to prove a nexus between the planned murder and theft. The evidence is legally insufficient, according to Appellant, because the State did not prove "the murder occurred in order to facilitate the taking of property." Appellant argues that he only sought to obtain control of Daggett's truck in order to conceal the crime of murder, which is a taking that is insufficient to elevate the proposed murder into capital murder. Therefore, Appellant maintains the element of robbery has not been met because he did not plan to kill Daggett to take the truck, but rather intended to take the truck "to facilitate the commission of murder."

The State counters that the evidence is sufficient to show that at the time Appellant sought Penn's assistance, Appellant intended to commit robbery by killing Daggett and taking his truck, which enhances this case from solicitation of murder to solicitation of capital murder. The State acknowledges that Appellant is correct in stating "a killing followed by unrelated taking of property is not capital murder." *Tolbert v. State*, 306 S.W.3d 776, 777 (Tex.Crim.App. 2010). However, the State argues that the robbery predicate is met so long as Appellant sought to murder Daggett with the requisite intent to take the truck formed before or during the planned murder.

*1.*
*Standard of Review*

Due process requires the State to prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex.CrimApp. 2010)(determining that *Jackson* standard "is the only standard that a reviewing court should apply" when examining sufficiency of evidence). When considering the sufficiency of the evidence, we assess all trial

evidence "in the light most favorable to the prosecution," to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Emphasis in orginal]. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. We review all record evidence—direct or circumstantial, properly admitted or not. *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). We measure legal sufficiency based on the statutory elements of the offense as modified by the allegations set out in the indictment. *Malik v. State*, 953 S.W.2d 234, 239 (Tex.Crim.App. 1997).

In this procedural posture, we are not permitted to sit as "thirteenth jurors" and substitute our judgment for that of the fact-finder, and we generally defer to the jury's verdict when the record evidence paints conflicting pictures of innocence and guilt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010); *Goodman v. State*, 66 S.W.3d 283, 286 n.4 (Tex.Crim.App. 2001). Even so, we act as a procedural failsafe against irrational verdicts, and we may reverse a conviction on legal sufficiency grounds where no rational juror could find guilt beyond a reasonable doubt based on the evidence presented at trial. *Clayton*, 235 S.W.3d at 778. This encompasses both situations in which the State has failed to prove an essential element of the crime as a matter of law and situations in which some evidence exists on every element, but no reasonable person could convict in light of the state of evidence as a whole, even when viewed most favorably to the prosecution. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789 (constitutional legal sufficiency standard in criminal cases higher than "mere modicum" evidence standard); *Brooks*, 323 S.W.3d at 906-07.

*2.*
*Applicable Law*

As an elemental matter, solicitation of capital murder consists of several interlocking predicate crimes, each with its own sub-elements. "[T]he offense of solicitation is complete when the defendant has intent [that a capital felony be committed] and acts to induce another to engage in felonious conduct." [Internal emphasis omitted]. *Whatley v. State*, 946 S.W.2d 73, 79 (Tex.Crim.App. 1997); TEX.PENAL CODE ANN. § 15.03 (West 2011). In this case, the indictment alleged that Appellant solicited capital murder, which here meant that Appellant solicited Penn's help with the commission of a murder in the course of a robbery. TEX.PENAL CODE ANN. § 19.03(a)(2)(West Supp. 2016). "A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he assaults another person." [Internal quotation marks omitted]. *Cooper v. State*, 67 S.W.3d 221, 222 (Tex.Crim.App. 2002); *see also* TEX.PENAL CODE ANN. § 29.02(a)(West 2011). In addition, "'[i]n the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." TEX.PENAL CODE ANN. § 29.01(1). An individual commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX.PENAL CODE ANN. § 31.03(a)(West Supp. 2016).

The Court of Criminal Appeals recently addressed the issue of whether the State must prove the murder is committed to facilitate the underlying felony in capital murder cases. *Griffin v. State,* 491 S.W.23d 771, 776 (Tex.Crim.App. 2016). The answer was "the plain language of Section 19.03(a)(2) contains no general requirement that in order to constitute capital murder, the murder must be committed to facilitate the underlying felony offense." *Id.* at 776. The Court also pointed out that this argument had been previously rejected. *Id., citing Dorough v. State,*

639 S.W.2d 479, 480-81 (Tex.Crim.App. 1982); *Moore v. State,* 542 S.W.2d 664, 674-75 (Tex.Crim.App. 1976). The *Griffin* Court further stated that "a felony that is committed as an afterthought and unrelated to the murder is not sufficient to prove capital murder under Section 19.03(a)(2)." *Griffin,* 491 S.W.3d at 776, *citing Herrin v. State,* 125 S.W.3d 436, 440-41 (Tex.Crim.App. 2002)(capital murder insufficient when no evidence appellant intended to kidnap victim before or during murder).

In *Griffin*, the defendant killed the victim while her nine-year-old son slept in the apartment. *Griffin*, 491 S.W.3d at 773. After the victim was dead and the defendant became aware of the boy's presence, the defendant told him to go to his room and later attacked the child. *Id.* at 773-74. The defendant was charged and convicted of capital murder in the course of kidnaping the child. *Id.* at 772. On appeal, the defendant argued he did not commit the murder to facilitate the kidnaping but rather he attacked the child "in order to delay the discovery" of the murder of the mother. *Id.* at 774. The Court held there was no evidence in the record to prove that when the defendant entered the apartment, he intended to kidnap the child, but rather he killed the victim before he became aware that the child was in the apartment. *Id.* at 775. The *Griifin* Court found that the requisite intent for kidnaping had not been formed prior to the murder and the child had not been kidnapped but assaulted. *Id.*

### 3.
### *Analysis*

At the outset, we note that Appellant concedes the evidence is sufficient to support the solicitation of murder, but attacks the robbery predicate that elevates this case from solicitation of murder to solicitation of capital murder. Appellant acknowledges the evidence showed that he intended to take Daggett's truck after he killed Daggett. Penn testified that Appellant was going to use the truck to dispose of Daggett's body. Appellant points to the evidence that showed he

19

planned to kill Daggett, but only took the truck to hide Daggett's murder as opposed to killing Daggett to obtain control of Daggett's truck.

Appellant argues that the State must prove "the murder occurred in order to facilitate the taking of property." Clearly, the Court of Criminal Appeals in *Griffin* refutes that proposition. *Griffin*, 491 S.W.3d at 776. In applying the holding in *Griffin*, the intent to take Daggett's truck was formed prior to his "contemplated" murder, thus satisfying Section 19.03(a)(2) that the murder was committed during or after the commission of the underlying felony. The evidence that Appellant formed the intent to take Daggett's truck prior to Daggett's murder is sufficient to support his conviction of solicitation of capital murder.[2]

Issue One is overruled.

## II.
### PRE-INDICTMENT DELAY: THE "COLD CASE" DEFENSE

In Issue Two, Appellant contends the State of Texas violated his procedural due process rights by waiting twenty-one years to indict him for soliciting Joe Daggett's murder when it had all the evidence it needed to move forward with a solicitation prosecution within six months of Daggett's disappearance. As such, he asserts dismissal of the case is proper. We disagree.

### *Standard of Review and Applicable Law*

---

[2] *See Shuffield v. State*, 189 S.W.3d 782, 791 (Tex.Crim.App. 2006)("Evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder.")[Original emphasis omitted]; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App. 1995)("If there is evidence . . . from which the jury could rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proven that the murder occurred in the course of robbery."); *Nelson v. State*, 848 S.W.2d 126, 132 (Tex.Crim.App. 1992)("What elevates the occurrence of theft to robbery is the presence, at the time of, or prior to, the murder, of the intent to obtain or maintain control of the victim's property. Thus, if the State proves that the requisite intent was present, it has proven that a murder occurred in the course of robbery, although the element of appropriation occured after the murder."); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Crim.App. 1986)("Since the State alleged the same assaultive conduct for both the murder and the robbery, it had to prove that the appellant intentionally strangled the deceased with the intent to obtain control of the deceased's property.")[Original emphasis omitted]; *see also Cameron v. State*, 925 S.W.2d 246, 249 (Tex.App.--El Paso 1995, no pet.)("The ultimate question is whether any rational trier of fact would be justified in finding, from the evidence as a whole, that the defendant intended to take his victim's property before, or as the murder occurred.").

Although the trial court generally has no power to dismiss an indictment unless the State consents, pre-indictment delay that violates a defendant's constitutional rights may grant the trial court good cause to dismiss the indictment over prosecutorial objections. *See State v. Terrazas*, 962 S.W.2d 38, 41 (Tex.Crim.App. 1998). We review the trial court's decision regarding dismissal for pre-indictment delay under a bifurcated standard of review. *State v. Krizan-Wilson*, 354 S.W.3d 808, 815 (Tex.Crim.App. 2011). "The court of appeals must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness." *Id*. at 815. "However, the court of appeals applies a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations." *Id*.

Generally speaking, the only time restriction the State must abide by before bringing an indictment against a defendant is the legislatively-enacted statute of limitations. *Krizan-Wilson*, 354 S.W.3d at 813-14. In the State of Texas, solicitation of murder and solicitation of capital murder have no statute of limitations. *See* TEX.CODE CRIM.PROC.ANN. art. 12.01(1)(A)(West Supp. 2016). Even so, in rare cases, indictment within the statute of limitations period may be barred by due process considerations. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971); *Krizan-Wilson*, 354 S.W.3d at 814; *Garrett v. State*, No. 08-13-00323-CR, 2015 WL 6741934, at *9 (Tex.App.--El Paso Nov. 4, 2015, pet. ref'd)(not designated for publication)(holding that the U.S. Constitution's Due Process Clause protects against some instances of pre-indictment delay); *see also State v. Kuri*, 846 S.W.2d 459, 471 (Tex.App.--Houston [14th Dist.] 1993, pet. ref'd), *abrogated on other grounds by Johnson v. State*, 954 S.W.2d 770, 771 (Tex.Crim.App. 1997)(noting that the due course of law clause in Article 1, Section 19 of the Texas Constitution also protects against certain types of pre-indictment delay).

21

To be entitled to relief on a pre-indictment delay claim, the defendant must show the delay (1) caused substantial prejudice to his right to a fair trial and (2) was an intentional device used to gain a tactical advantage over the accused or for some other bad-faith purpose. *Garrett*, 2015 WL 6741934, at *9. "[W]e may not infer bad faith from the existence of delay and prejudice [alone]." *Id*. at *11.

*Analysis*
**Presumption of Prejudice Under Due Course of Law?**

At the outset, we dispose of two of Appellant's threshold arguments.

First, Appellant contends that we should presume prejudice, given the sheer length of the twenty-one year delay in prosecuting this case. We rejected a similar presumption last term in *Garrett*, decided after this case was submitted. *See* 2015 WL 6741934, at *10 (holding that a thirty-six-year pre-indictment delay standing alone was insufficient to show prejudice to due process rights). The Due Process Clause does not create an absolute bar on prosecution after a certain number of years where the Legislature has otherwise declined to impose one. *Id*. Rather, each prosecutorial delay case must be assessed based on its unique facts and circumstances. *Id*.

Second, while acknowledging that the current state of pre-indictment delay jurisprudence does not afford him a presumption of prejudice as a matter of federal constitutional law, Appellant maintains that Article 1, Section 19 of the Texas Constitution[3] affords him greater protections against pre-indictment delay than those provided by the federal constitution's due process clause. We read Appellant's argument as inviting us to impose the presumption we rejected in *Garrett* as a matter of Texas constitutional law. This argument was not raised or squarely addressed in *Garrett,* nor, as far as we can tell, has it been addressed at length by the Texas Court of Criminal Appeals or our sister courts. *See*, *e.g.*, *Ibarra v. State*, 11 S.W.3d 189

---

[3] "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX.CONST. art. 1, § 19.

194 (Tex.Crim.App. 1999)(where defendant raises a due course of law challenge to pre-indictment delay, Court of Criminal Appeals declined to define the scope of Texas constitutional protections, instead stating that even under defendant's proposed due course of law standard he could not win his case). Appellant cites no authority directly supporting his specific argument, but instead points to *Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App. 1991), a search-and-seizure case in which the Texas Court of Criminal Appeals recognized that in certain instances, the Texas Constitution may provide criminal defendants with protections beyond those spelled out in the federal constitution. *See id*. at 682-83 (explaining that under a "new federalism" approach to constitutional interpretation "a state is free as a matter of its own law to impose greater restrictions on police activity than those the Supreme Court holds to be necessary upon federal constitutional standards").

We recognize that the Texas constitution may provide greater protection to criminal defendants than the federal constitution in some instances. However, we have previously found no analytical distinction between the federal due process clause and the Texas Constitution's due course of law provision. *Murphy v. State*, 26 S.W.3d 502, 505-06 (Tex.App.--El Paso 2000, pet. ref'd)(noting in dual due process and due course of law challenge to jury instructions that "[t]he Due Course of Law provision found in Article I, section 19 of the Texas Constitution does not afford a defendant with more protection or greater rights than the United States Constitution."). We do not discount the possibility, in the abstract, that the due course of law provision may eventually be shown to provide greater protections those recognized under federal due process. *Cf. Gibson v. State*, 921 S.W.2d 747, 763-65 (Tex.App.--El Paso 1996, writ denied)(recognizing in Fourth Amendment context that post-*Heitman* jurisprudence allowed for possibility that appellate courts could increase search and seizure protections under state constitution in the

23

event increased protections were "justified by the facts of the case, state precedent on the issue, and state policy considerations"). However, Appellant has cited no substantive authority suggesting our prior assessment of the relationship between the due process clause and the due course of law provision is incorrect, nor has he explained what policy reasons should drive the extra protections he proposes or why his case is different. Absent these factors, the dictates of stare decisis govern, *Murphy* controls, and we will assume the protections against pre-indictment delay contemplated by both constitutional provisions are the same. *Accord Kuri*, 846 S.W.2d at 471 (concluding after brief analysis of both clauses under *Heitman* approach that the federal due process standards for pre-indictment delay should govern Texas due-course-of-law claims for pre-indictment delay).

### Prejudice and Bad Faith

Finally, we turn to the dispositive issues of prejudice and bad faith.

In support of his argument that the twenty-one year delay prejudiced his right to present a defense, Appellant points to the fact that his investigator Bob Peden testified he was unable to find or get in contact with certain witnesses who could corroborate his alibi, including Stella Rodriguez and Paula Warnock, who were listed as a state's witness but who never testified at trial, as well as "Sandra" the Mexican national listed in police reports. Likewise, his interview of Reynaldo Garcia Sanchez, who Ezell knew by his nickname "Peanuts," could not remember anything that happened that night. Appellant also asserts that witness testimony at trial shows that their loss of memory over the years has prejudiced him, claiming that Sheridan Porter testified she could not recall or remember at least thirteen times, William Conrad could not recall or remember at least twelve times, Jay Penn could not recall or remember at least thirty-two times, Barbara Penn could not recall or remember at least twelve times, and Dymphna De La

24

Rosa could not recall or remember at least twenty times. He maintains that the witnesses' collective inability to recall specific details of the events at various times supports his prejudice claim, citing Justice Douglas' concurrence in *Marion* for his claim that pre-indictment delay allowed these witnesses memories to fade without putting him on notice that he should be attempting to preserve evidence:

> The impairment of the ability to defend oneself may become acute because of delays in the pre-indictment stage. Those delays may result in the loss of alibi witnesses, the destruction of material evidence, and the blurring of memories. At least when a person has been accused of a specific crime, he can devote his powers of recall to the events surrounding the alleged occurrences. When there is no formal accusation, however, the State may proceed methodically to build its case while the prospective defense proceeds to lose his.

*Marion*, 404 U.S. at 331, 92 S.Ct. at 469 (Douglas, J., concurring).

Assuming without deciding that these lapses in memory and missing witnesses go beyond what is normally to be expected in prosecuting a case after two decades and establish substantial prejudice, Appellant failed to establish that the delay was used as a tactical move by the State, or that the State delayed prosecuting him for some other bad-faith purpose. Rather, the record reflects the delay ostensibly resulted from four separate district attorneys and the state attorney general's office facing a Hobson's choice based on the state of the evidence: prosecute a murder case without a body and risk a loss that would jeopardy-bar future prosecutions if the body is found, prosecute the winnable inchoate offense knowing that the defendant will only receive a fraction of the potential sentence he would receive if the body is found, or wait to see if more evidence surfaces. *Krizan-Wilson* makes clear that prosecutors may choose the third option without prejudicing a defendant's "speedy indictment" rights. *See Krizan-Wilson,* 354 S.W.3d at 819 (holding that "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable

doubt"). Absent other evidence of deliberate delay or malfeasance, Appellant cannot establish bad faith under these facts.

Issue Two is overruled.

## CONCLUSION

We find the evidence is sufficient to support the conviction and Appellant has failed to establish his claim for pre-indictment delay. The judgement of the trial court is affirmed.

October 5, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)