

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WAYNE THOMAS MITCHELL, | § | No. 08-15-00258-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 205th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC#20120D05850) |
| | § | |

## **O P I N I O N**

Wayne Thomas Mitchell was convicted of murder, aggravated assault with a deadly weapon, and aggravated robbery. He appeals his convictions for murder and aggravated robbery, claiming the evidence was legally insufficient to support the convictions. Specifically, he contends the evidence was insufficient to show he administered the killing blow to the murder victim, and the evidence was insufficient to support the intent to deprive element of aggravated robbery because he abandoned the property shortly after leaving with it. For the following reasons, we affirm.

## **BACKGROUND**

Appellant was discharged from the El Paso Psych Center towards the end of September

2012. He had been diagnosed with bipolar depression, and told medical personnel he had been feeling suicidal and homicidal. His treating physician had prescribed medication to treat his depression but Appellant discontinued the regimen, instead opting to self-medicate with cocaine.

On October 7, about two weeks after being released from the hospital, Appellant went to an apartment where he had previously purchased cocaine on several occasions. The apartment was a known drug house, and that evening Debra Buchanan and Marshall Dorris were selling crack-cocaine from the apartment. Arriving around 6:00 p.m., Appellant attempted to barter the use of his car—a white Cadillac—in exchange for crack. Debra declined the offer and Appellant left.

Later on, Appellant walked into the apartment unannounced. Debra and Marshall had now been joined by Ashley Pettigrew and Cliff Baker. Assuming Appellant had come to purchase crack, Debra reached into her brassiere to retrieve a bag of cocaine. Debra did not notice Appellant holding a knife in hand as he approached, and without saying a word he stabbed her.

Debra threw the cocaine—approximately twelve crystalized rocks—to the floor, and Appellant attempted to seize them. Before he could do so, Marshall rose from the couch and grabbed Appellant. The ensuing struggle was tumultuous, and the sounds of it brought Ashley running out of the bathroom where she found the two men fighting in the living room. Cliff, a wheelchair-bound man, remained on the couch during the confrontation.

Appellant stabbed Marshall multiple times during the fight, and after a brief struggle, Debra and Ashley saw Marshall fall abruptly to the floor. Debra, still bleeding profusely from her wound, told Appellant to "[j]ust go." Appellant picked up the crack-cocaine from the floor and ran for the door. Ashley noticed he was still holding a knife as he left.

Crystal Nazario was approaching the apartment at the time and saw Appellant burst out of the front door and run up the street. When she entered, she saw Marshall lying on the floor bleeding from his neck and the side of his mouth. She immediately backed out of the dwelling and shouted expletives after Appellant. Ashley meanwhile had called 911; Debra and Marshall were still bleeding, and the latter appeared to be on the verge of death.

Officers Thomas Ibarra and Maria Robles arrived at the apartment a few minutes after receiving the dispatch call and found Crystal, who was shouting to them that Appellant had just left the apartment and was running up the street. The officers approached the apartment to find Debra, still holding her side and bleeding, who explained she and Marshall had just been stabbed. When the officers entered the apartment, they saw Marshall lying face-down in a large pool of blood. Marshall was not breathing, and the officers called for Fire Medical Services to rush to the scene. An autopsy later revealed Marshall died of a stab wound to his neck, just above his collarbone.

Sometime after 10:00 p.m. that evening, Carolyn Benton—Appellant's cousin—and her husband, Joseph Jimmerson, were roused from sleep by knocking on their bedroom window. They went to the front door and found Appellant and another man whom they had never met before. Carolyn let the two men in and noticed Appellant was bleeding from cuts on his fingers.

Appellant, the unidentified man, and the couple then shared a small amount of crack-cocaine Appellant had brought with him and they began discussing whether anyone could obtain more cocaine. Carolyn called Bernadette, a person whom she had bought drugs from in the past. After the call, Appellant asked to use Carolyn's cellphone to make a call, but went outside to make it in private. Carolyn later testified Mitchell had never gone outside to make a call for cocaine

3

before.

After some time, Appellant reentered the home and told Carolyn he was going to use a pay phone near his barbershop to make another call. Appellant left, but did not return for some time. Joseph eventually went outside to look for Appellant, and saw Appellant's car was still parked outside on the street. Joseph went back inside and the three waited for Appellant's return.

Bernadette was at home playing videogames when she had first been called by Carolyn. Shortly after the first call, she received a second call from Appellant calling her on Carolyn's phone. Bernadette knew Appellant and had used drugs with him on prior occasions. Appellant asked Bernadette if she would come to Carolyn's apartment to give Carolyn a ride to Walmart. Bernadette agreed to do so and began driving her gold 2005 Kia Rio to Carolyn's. While en route, she received a third phone call from Appellant calling from a number she did not recognize, and told him she was on her way to Carolyn's.

As she pulled up to Carolyn's apartment, Bernadette did not see anyone outside. Moments later, Appellant abruptly entered the car from the front-passenger side. Although they had used drugs together before, Bernadette had never been alone with Appellant and something about the situation felt off. Appellant told her Carolyn and Joseph had already started walking to Walmart and were somewhere up the street.

After driving for only a block, Bernadette decided to stop her car and told Appellant to get out. Appellant told her to wait a moment and reached into his back pocket. Appellant suddenly pulled out a knife and stabbed her in the stomach. Bernadette tried to defend herself from Appellant but he continued stabbing her, slicing her fingers and cutting her in the leg and head. Appellant broke the knife's blade off as he continued to stab at Bernadette. Appellant grabbed

4

her by the neck and began trying to twist her neck. He told her, "I'm going to kill you, B*tch."

Appellant let go of her neck and began punching her in the mouth. While being punched, Bernadette was able to open her car door and fell out onto the street. Appellant moved into the driver's seat, put the vehicle in park, and leapt out on top of Bernadette and began strangling her. Suddenly, Appellant looked up from Bernadette, became wide-eyed, and let her go. He jumped back into her car and drove away.

Sometime after midnight, Robert Rodriguez heard a loud rumbling noise coming from the street outside his home on Tyler Avenue, about a mile away from Carolyn's apartment. Rodriguez looked out his window and saw a car drive slowly up the street and stop directly in front of his house. The vehicle's front-right tire was blown out. He saw a man get out of the car, open the back-driver's-side door, and pick up a rectangular-shaped object about the size of a laptop. The man then left on foot, leaving the car in front of Rodriguez's home. The vehicle was Bernadette's gold 2005 Kia Rio, and Appellant later admitted it was him Rodriguez saw exiting the vehicle that morning.

Meanwhile, a young man had approached Bernadette and flagged down a taxi to help. The driver helped Bernadette over to Carolyn's nearby apartment. About thirty minutes to an hour had passed since Joseph had gone outside looking for Appellant when they were brought to the door by yelling and frantic knocking. The couple opened the door to find Bernadette bleeding from her head, abdomen, and face, and claiming Appellant had stabbed her. Carolyn called 911, and medical help arrived within minutes.

Several police officers came to the apartment but left soon after Bernadette was taken to the hospital. One officer, however, remained behind in his squad car waiting for Appellant's

5

Cadillac to be towed away. Appellant returned to Carolyn's apartment, shirtless and acting agitated, and asked to be let back in. Joseph refused to let him enter the apartment, and Appellant left. After he left, Joseph walked over to the lone remaining officer and told him Appellant had come by the apartment.

Sanae Sdurdivnt, Appellant's girlfriend, was awoken at home by the sound of her dog barking. When she looked outside and saw Appellant, she let him in. He was sweating and breathing heavily, and was acting aggressively. Appellant told Sanae he had gotten into a fight, but would not say more. Sanae stated she had never seen Appellant acting the way he did that night. She let Appellant use her shower to wash off, and he left immediately after.

The next morning, A.A., a young boy, woke up and took the trash out to the trash cans outside his family's apartment. When A.A. approached the trash cans, he noticed a white plastic trash-bag outside. Thinking it unusual because his family only used black trash bags. He and his father looked inside the bag, they found it full of bloody clothes, including a pair of jeans and a shirt. A.A.'s father then called the police and gave the bag to an officer. Testing later determined that the blood on the clothing belong to Marshall, the fatal victim of the stabbing at the drug house. That same morning, Veronica Diaz also found a pair of jeans and socks in her driveway as she prepared to leave for work. The jeans and socks were bloodstained, and Veronica placed them in a bag and later handed them over to police. Testing revealed the blood on these items was Bernadette's.

Later that day, Officer Saul Gutierrez was patrolling the northeast area of El Paso when he received a call for a wanted subject possibly in the area. After driving around the area for a while, Officer Gutierrez found Appellant walking along the street carrying a white bag. He then pulled

6

up near Appellant, parked his car, got out, and yelled at Appellant to show him his hands. Appellant told Officer Gutierrez to stay back, and pulled a metal object out of his pocket and began slicing up and down on his own wrists. Officer Gutierrez attempted to approach Appellant, but Appellant turned and ran. The officer called for backup and began to chase Appellant on foot. Other officers soon arrived and pursued Appellant, eventually catching up to him and arresting him.

Appellant was charged with the murder of Marshall Dorris, aggravated assault with a deadly weapon causing bodily injury to Debra Buchanan, aggravated robbery causing bodily injury to Bernadette Rivera, and aggravated assault for stabbing Bernadette. The State later dismissed the count of aggravated assault against Bernadette. The jury convicted Appellant of the remaining three counts, assessing punishment at 39 years' confinement and a $5,000 fine for the murder count, 7 years' confinement and a $1,000 fine for the aggravated-assault count against Debra, and 31 years' confinement and a $2,000 fine for the aggravated-robbery count, all three sentences to run concurrently. This appeal followed.

## DISCUSSION

### Sufficiency of the Evidence: Murder

In his first issue, Appellant contends the evidence was legally insufficient for the jury to find him guilty beyond a reasonable doubt of murdering Marshall. Specifically, he contends the absence of eyewitness testimony regarding the specific wound to the neck, the description of one eye witness of stabbing in an underhanded motion, and a statement by the State's expert witness that the blood spatter was inconsistent with Marshall falling a certain way after being stabbed, all add up to a rational jury being unable to find him guilty beyond a reasonable doubt.

7

### *Standard of Review*

An essential element of due process as guaranteed by the Fourteenth Amendment is that the State prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). When assessing the legal sufficiency of the evidence, the reviewing court does not act as a thirteenth juror, reweighing the evidence and substituting its judgment for that of the jury. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999), *holding modified by Guidry v. State*, 9 S.W.3d 133 (Tex.Crim.App. 1999). Instead, we view the evidence in the light most favorable to the verdict, and will uphold the conviction if there is sufficient evidence to justify any rational trier of fact to find the appellant guilty beyond a reasonable doubt on all essential elements of the offense. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). We measure the legal sufficiency of the evidence based on the statutory elements of the offense as modified by the allegations set out in the indictment. *Saul v. State*, 510 S.W.3d 672, 683 (Tex.App.--El Paso 2016, pet. ref'd)(citing *Malik v. State*, 953 S.W.2d 234, 239 (Tex.Crim.App. 1997)). Further, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). If any conflicting inferences are raised by the record, we must presume the fact finder resolved them in favor of the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007).

### *Analysis*

Under the Texas Penal Code, a person commits the offense of murder if he intentionally or knowingly causes the death of another or, if with intent to cause serious bodily injury, he commits

an act clearly dangerous to human life that causes the death of another. TEX.PENAL CODE ANN. §§ 19.02(b)(1)–(2)(West 2011). In reviewing the sufficiency of the evidence, it is well settled that so long as the circumstances surrounding the victim's death would allow a rational fact finder to infer the defendant inflicted the fatal wound, it is not necessary that an eyewitness actually saw the killing blow administered. *Lucio v. State*, 351 S.W.3d 878, 895 (Tex.Crim.App. 2011)(opportunity to inflict fatal injuries, coupled with pattern of previous abuse and statement by appellant that she was the only one who hit the victim, was sufficient to support the conviction); *Garza v. State*, 398 S.W.3d 738, 745 (Tex.App.--Corpus Christi 2010, pet. ref'd)(evidence sufficient to sustain murder conviction where, although no witness actually saw defendant pull the trigger, defendant was only person seen standing nearby with a gun, and defendant fled the scene immediately after the shooting); *Molinar v. State*, 910 S.W.2d 572, 584-85 (Tex.App.--El Paso 1995, no pet.)(despite the lack of eyewitnesses who actually saw defendant stab victim, evidence was sufficient to sustain murder conviction where defendant was seen holding a knife before and after he was approached by the victim, who later died of a stab wound). Further, attempts to conceal incriminating evidence, implausible explanations, flight from the scene, and other evidence of subterfuge—if believed to be such by the jury—may constitute affirmative evidence of the defendant's guilt. *Huffman v. State*, 775 S.W.2d 653, 660 (Tex.App.--El Paso 1989, pet. ref'd).

Here, as modified by the indictment, the State was required to prove either; (1) Appellant, (2) intentionally and knowingly, (3) caused the death of Marshall by stabbing him with a knife, or (1) Appellant, (2) with intent to cause serious bodily injury to Marshall, (3) committed an act clearly dangerous to human life by stabbing Marshal with a knife, (4) said act having caused

9

Marshall's death.   TEX.PENAL CODE ANN. §§ 19.02(b)(1)–(2).   Appellant contended at trial that someone else must have stabbed Marshall in the neck after he ran out of the apartment, and now asserts certain conflicting testimony and the absence of an eyewitness who could testify to actually seeing Appellant inflict the neck wound would have prevented the jury from rationally concluding he killed Marshall.   Thus, Appellant challenges only that he was the cause of Marshall's death.

The evidence in this case was sufficient for a jury to rationally conclude Appellant killed Marshall.   Appellant freely admitted to stabbing Marshall multiple times during the fight (though he claimed he did not stab him in the neck).   Debra and Ashley both witnessed Marshall dropping suddenly to the floor after a brief struggle with Appellant.   Ashley testified she saw Appellant holding a knife in his hand as he fled the apartment.   Crystal testified she walked in to the apartment only moments after Appellant had left and saw Marshall lying on the ground bleeding from his neck and mouth.   While neither Debra nor Ashley testified to seeing Appellant plunge the knife into Marshall's neck, such testimony is not required provided the cumulative force of the circumstances are sufficient to support the conviction.   *Lucio*, 351 S.W.3d at 895.   A rational juror could have concluded from the circumstances and testimony that during Appellant's admitted stabbing of Marshall one of the blows he administered was the neck wound that caused Marshall's death.   *Molinar*, 910 S.W.2d at 584-85.   The same holds true for Appellant's argument that Debra's description of an underhanded stabbing proved he did not inflict the neck wound because that wound was made at a downward angle; failure of the witness to actually see the fatal blow does not deny the jury the opportunity to conclude it was made by the defendant.   *Garza*, 398 S.W.3d at 745.   Regarding the State's expert-witness testimony, Dr. Contin testified the blood spatter on the floor and on Cliff's wheelchair would not have occurred if Marshall had quickly

10

fallen face down. But Dr. Contin also offered alternative explanations during defense counsel's examination of him and did not, as Appellant suggests, state the blood spatter was completely inconsistent with the witnesses' accounts of the event. The jury is entitled to draw reasonable inferences from basic facts to ultimate facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex.Crim.App. 2015). More importantly, as noted above, we must presume the jury resolved any conflicting inferences in favor of the verdict. *Clayton*, 235 S.W.3d at 778. The jury could have rationally discounted Appellant's theory regarding the blood spatter and inferred that one of the multiple stab wounds inflicted by Appellant was the fatal neck wound. Further, Appellant's attempts to conceal his bloody clothing in the white trash bags, his implausible explanation of another stabbing after he left, and his flight from the scene could all be considered by the jury as affirmative evidence of his guilt. *Huffman*, 775 S.W.2d at 660. Accordingly, viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to justify a rational trier of fact to find beyond a reasonable doubt Appellant inflicted the fatal stab wound on Marshall's neck. *Salinas*, 163 S.W.3d at 737. Because Appellant does not contest any other element of the offense, his first issue is overruled.

**Sufficiency of the Evidence: Aggravated Robbery**

In his second issue, Appellant contends there was legally insufficient evidence for the jury to find him guilty beyond a reasonable doubt of the intent to deprive element of aggravated robbery because he abandoned the vehicle shortly after taking it.

*Standard of Review*

As noted above, in a legal sufficiency challenge we view the evidence in the light most favorable to the verdict, and will uphold the conviction if there is sufficient evidence to justify any

rational trier of fact to find the appellant guilty beyond a reasonable doubt on all essential elements of the offense. *Salinas*, 163 S.W.3d at 737. We measure the legal sufficiency of the evidence based on the statutory elements of the offense as modified by the allegations set out in the indictment. *Saul*, 510 S.W.3d at 683. We must presume the fact finder resolved any conflicting inferences raised by the record in favor of the verdict. *Clayton*, 235 S.W.3d at 778.

*Analysis*

Under the Texas Penal Code, a person commits the offense of robbery if, in the course of committing a theft as defined in Chapter 31 of the Penal Code and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. TEX.PENAL CODE ANN. § 29.02(a)(1)(West 2011). A person commits the offense of aggravated robbery if he commits a robbery and uses or exhibits a deadly weapon. TEX.PENAL CODE ANN. § 29.03(a)(2)(West 2011). A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. TEX.PENAL CODE ANN. § 31.03(a)(West Supp. 2017). Proof of a completed theft is not required to establish a robbery, and an intent to steal may be inferred from circumstantial evidence. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex.Crim.App. 1996). Further, "[t]he fact that the depravation later became temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition." *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App. [Panel Op.] 1981).

Here, after having used cocaine with the others at Carolyn's apartment, the group began discussing where to get more cocaine. Carolyn called Bernadette, whom she had purchased cocaine from previously. Appellant then asked to use his cousin's cellular phone, stepped outside, and called Bernadette and asked her to come pick his cousin up to take her to Walmart. He called

12

a second time from an unknown number to confirm she was on her way to pick up his cousin. When Bernadette arrived at the cousin's house, Appellant surprised her by jumping into her passenger seat and telling her to go ahead and start driving because the cousin had already started walking. Bernadette testified she felt uncomfortable and, about a block later, told Appellant to get out of the car. He then pulled a knife and began stabbing her. His knife blade broke off after stabbing her several times, and he then began choking and punching Bernadette and told her he was going to kill her. Bernadette managed to open the car door and fall out backwards. Appellant leapt out and jumped on top of her and began strangling her. Appellant then stopped, got back into the car and drove off. While driving the car, Appellant blew out the front passenger-side tire, and pulled the vehicle over at Rodriguez's home, whom he had never met. Rodriguez observed Appellant stop the car, remove an object from the vehicle, and walk away on foot.

Appellant cites *Clark v. State*, 134 Tex.Crim. 427, 115 S.W.2d 953 (1938), claiming its holding requires reversal here. The case is distinguishable. There, the defendant was picked up at a bar at 4:00 a.m. by a taxicab driver and became incensed when the driver called him "[d]ude." *Id*., at 427. The defendant pulled a gun on the driver and told him he should kill him for calling him that. *Id*. The driver then jumped out of the vehicle while it was moving and the defendant took control of the vehicle. *Id*., at 428. The police found the vehicle about four hours later in the same general area with the keys still inside. *Id*. The court held because the defendant had to take control of the vehicle or suffer a wreck, and because he apparently left the vehicle nearby with the keys inside so it could be recovered, there was insufficient evidence to support the intent element required for robbery. *Id*. Here, however, Appellant placed the vehicle in park after Bernadette fell out and then began choking her. He suddenly stopped choking her and reentered

13

the vehicle and drove it away. Appellant only abandoned the vehicle after blowing out the tire and evinced no intent prior to that point of leaving the vehicle nearby so it could be recovered. The evidence here was sufficient for a jury to rationally conclude Appellant intended to deprive Bernadette of her vehicle and was only thwarted by the blowout. *Griffin*, 614 S.W.2d at 159 (evidence the taxicab was abandoned less than fifteen minutes after the defendant produced a revolver and told driver to get out was not insufficient to show intent to deprive element of aggravated robbery). Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence for the jury to find Appellant guilty of aggravated robbery beyond a reasonable doubt. *Wolfe*, 917 S.W.2d at 275. Accordingly, Appellant's second issue is overruled.

## CONCLUSION

Having overruled both of Appellant's issues, the judgment of the trial court is affirmed.

July 31, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J. (Not Participating)

(Do Not Publish)

14