

# NUMBER 13-09-00450-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JOSE FIDENCIO TREVINO GARZA,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                          **Appellee.**

### On appeal from the 92nd District Court
### of Hidalgo County, Texas.

# OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Vela**
**Opinion by Chief Justice Valdez**

Appellant, Jose Fidencio Trevino Garza, was convicted of murder, a first-degree felony, and was sentenced to eighty years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (Vernon 2003). By three issues, Garza contends that the evidence was legally and factually insufficient to support the jury's verdict and that the trial court erred by

denying his motion for a directed verdict.  We affirm.

## I. BACKGROUND

On the afternoon of January 21, 2008, Rudolph Johnston and Alejandro Macias arrived at the Cardinal Express convenience store in La Villa, Texas.  Macias exited the passenger side of Johnston's truck and, within moments, was shot and killed.

### A.      Eyewitness Testimony

### 1. Johnston's Testimony

Around 1:00 p.m., Johnston, as he did most days, picked up Macias at Cardinal Express to help with various tasks around his ranch.  After they finished working, Johnston drove Macias back to Cardinal Express at approximately 3:40 p.m.  Johnston testified that, when he turned into the parking lot, Garza pulled away from Cardinal Express's drive-through window in a green Jeep Cherokee and "kept staring at [him]."  Johnston asked Macias who Garza was, and Macias responded, "Joe Garza" or "the Cat," in a manner that Johnston described as sounding "like they [Macias and Garza] were real good friends or something."  Johnston then parked in front of Cardinal Express, exited his white Dodge truck, and asked Macias to throw away his trash.  Johnston testified that as he stepped into the Cardinal Express doorway, he heard Macias say, "hey, Cat," and then he heard a gunshot.  Johnston turned around and saw Macias "run to the front" of the Dodge, lean on its hood, grab his chest, and fall to the ground.  Johnston told Macias's niece, Deborah Diaz, and her common-law husband, Jesse James Saenz—both of whom worked at Cardinal Express—to call the cops.  Johnston then looked to his left and saw Garza standing outside the store "with a gun in his hand."  On direct-examination, Johnston described the gun as a chrome or nickel-plated .38 automatic or a revolver.  However, on

2

cross-examination, Johnston admitted that in a statement given to police, he described the gun as a semi-automatic handgun.

Johnston testified that after the shooting, Garza "looked at [Johnston] and turned around and walked off" then got into his Jeep and drove away. Johnston then approached Macias and checked for a pulse but found none.

### 2. Diaz's Testimony

Diaz testified that her mother owns Cardinal Express and that, on January 21, 2008, Diaz was working at the store as a cashier. Diaz stated that at approximately 2:45 p.m., she saw Garza drive up to Cardinal Express's drive-through window in a green Jeep Cherokee and purchase a twenty-four ounce can of Natural Light beer. Diaz knew Garza because he had come into the store on a few occasions. Shortly after Garza drove away from the window, Diaz saw Johnston and her uncle, Macias, park in front of the store. Diaz stated that, as Saenz began to walk to the store's open front door to greet Macias, she "heard what [she] thought was a firecracker." Diaz followed Saenz to the door to investigate the noise. As Saenz reached the door, he instructed Diaz to call 911. Diaz testified that she saw Macias "take a couple of steps" towards Cardinal Express before he "fell right in front." Diaz called 911 on a cordless phone and, at some point, walked out of the store and saw Garza's face as he got back into his Jeep. Diaz testified that the only vehicles in the parking lot at the time of the shooting were Garza's Jeep and Johnston's Dodge. On cross-examination, Diaz admitted that she did not see Garza with a gun.

### 3. Saenz's Testimony

Saenz testified that he sold a twenty-four ounce beer to Garza at Cardinal Express's drive-through sometime after arriving at work at approximately 3:00 p.m. on January 21,

2008. Saenz testified that "within a minute or less than 45 seconds" after Garza pulled away from the window, he heard what he thought was a firecracker. Saenz looked outside and saw Macias "staggering and grabbing his chest." Saenz then saw Garza inside the Jeep. Saenz stated that "Garza just looked at [Saenz] real quick like that. Like he hadn't done anything and boom he just took off." Saenz recalled that Johnston told Diaz and him to call an ambulance, and Sandra, a Cardinal Express employee who had been working at the back of the store at the time of the shooting, placed a blanket over Macias. Saenz testified that he was "200 percent positive" that Garza shot Macias. However, on cross-examination, Saenz stated that he did not actually see Garza with a gun or fire a shot at Macias.

### 4. Bernal's Testimony

Melva L. Bernal testified that sometime after 3:00 p.m. on the day in question, she drove in front of Cardinal Express. As she sat in her vehicle waiting to turn onto a street near the store, she heard "a pop" and saw a person run inside Cardinal Express. As she turned her vehicle onto the nearby street, Bernal saw another person run and then fall to the ground and a third person standing next to a Jeep. Although the man near the Jeep looked familiar, Bernal did not initially recognize him. Sensing that whatever was happening was "not something good," Bernal memorized the numbers and letters of the Jeep's license plate and wrote them on a sheet of paper as she drove to her house. After Bernal arrived home, she realized that the man that she had seen next to the Jeep was Garza, her friend's ex-brother-in-law. Later that evening, Bernal's cousin informed her that there had been a shooting at Cardinal Express. Bernal told her cousin what she had seen and then rode with him to Cardinal Express where police took down her information.

4

Bernal did not give the police Garza's name at that time. Three days later, the police took Bernal's statement, and she identified Garza from a photographic line-up and stated that his name was "Joe Garza."

On cross-examination, Bernal admitted that she knew Garza's ex-wife. Bernal also acknowledged that she had heard on the news that Joe Garza was a suspect before she provided his name to police. However, Bernal insisted that she had realized that the man she saw standing next to the Jeep was Garza before she saw the news report.

### 5. Other Eyewitnesses

Valente Garcia testified that he "heard a gunshot or two" on the afternoon of January 21, 2008, while he was raking leaves outside his home located two blocks from Cardinal Express. Garcia disregarded the noise because he believed that it was fireworks.

Porfirio Guerrero Jr. stated had known Macias for twenty years and that Garza is his "good friend." On the date in question, Guerrero heard something that sounded like a firecracker as he and his friend, Michael Flores, drove near Cardinal Express. When Guerrero passed Cardinal Express, he saw Saenz and Diaz standing near a body that was lying on the ground. Guerrero denied seeing Garza at Cardinal Express; however, he admitted that he told police that he "saw Joe driving off in the Jeep." Guerrero explained that, although he had seen Garza's Jeep driving out of the parking lot, he had not actually seen Garza in the Jeep.

Flores testified that he knows Garza and Macias and that he "heard one bang" shortly before he and Guerrero drove past Cardinal Express. Flores stated that as they drove by, Guerrero said, "[t]here goes Joe." Flores did not see Garza's Jeep at Cardinal Express and interpreted Guerrero's comment to mean that Garza was the person that they

5

saw laying on the ground and believed was dead.

## B.     Forensic and Police Testimony

Hidalgo County Chief Forensic Pathologist, Norma Jean Farley, M.D., testified that she performed Macias's autopsy and concluded that his death was caused by a gunshot wound to the chest. Dr. Farley testified that people who sustain a wound like Macias's do not "die instantaneously" and, "depending on how much adrenaline they . . . have moving through their system," are able to "walk and move and talk until they die." A single bullet that perforated Macias's heart, aorta, esophagus, and left lung was recovered during the autopsy. Richard Hitchcox, a forensic firearm and tool-mark examiner with the Texas Department of Public Safety Crime Laboratory in McAllen, Texas, identified the bullet as a lead .38 caliber bullet. Hitchcox testified that the lead composition and grooves around the bullet indicated that it was fired from a revolver—a firearm that does not automatically discharge spent cartridge casings.

Max Cantu, an investigator with the Hidalgo County Sheriff's Office, testified that he responded to a shooting at Cardinal Express between 4:00 and 4:30 p.m. on January 21, 2008. Investigator Cantu noticed a trail of "fresh" blood from a trash can outside Cardinal Express to Macias's body located in front of Johnston's Dodge. Police searched the area; however, no cartridge casings or bullets were located. The only gun found at the scene was a .22 caliber handgun registered to Johnston and found under a seat in his Dodge. At trial, Johnston stated that he carried the .22 caliber handgun in his truck for protection from coyotes, wild dogs, and snakes on his ranch. Investigator Cantu testified that during the investigation, Johnston informed the police of the presence of the gun in his truck and that no evidence suggested that Johnston's .22 caliber handgun was taken out of the

6

Dodge or used to shoot Macias on January 21.

While at the scene, officers spoke to Saenz, Diaz, and Johnston and received a phone call from Garza's brother. Garza's brother, the police chief in a neighboring community, told the officers that "family members had contacted him and told him that [Garza] had been involved in a homicide or was a suspect of a homicide." Garza's brother informed the officers of Garza's whereabouts. After obtaining information identifying Garza as the man in the green Jeep and as holding a gun at the time Macias was shot, the police obtained an arrest warrant for Garza. Police later discovered that the license plate number that Bernal recorded seeing on the green Jeep that left Cardinal Express soon after the shooting matched the license plate on Garza's Jeep.

Police arrested Garza at his mother's home in Mercedes, Texas, at approximately 8:20 that night. Garza complied with police and was transported to the Hidalgo County Sheriff's Office. Investigator Cantu testified that, after obtaining consent, officers searched Garza's mother's home but did not locate a firearm. The officers found ammunition in a bedroom where Garza was believed to have been staying for a few days; however, Investigator Cantu stated that the ammunition recovered was not similar to that used in the shooting. Investigators also searched Garza's Jeep, another home where he sometimes resided, and a location in San Benito, Texas, that Garza was believed to have visited on the day of the shooting, but no gun or ammunition was found.

On January 22, 2008, police, acting under an evidentiary warrant, searched Garza's mother's house for a second time. Investigator Cantu testified that the officers found an "old" gun, additional ammunition, and clothing believed to have been worn by Garza at the time of Macias's shooting. The gun was found in a display case and covered in dust.

7

There were cobwebs in the barrel, the cylinder did not lock into position, and there were "two cracks in the forcing column." Hitchcox testified that the condition of the gun made it unsafe to fire and excluded the gun as the weapon used in Macias's shooting. Eduardo Aleman, a Hidalgo County Sheriff's Office crime scene specialist, discovered a box that contained twenty-three .38 caliber rounds and nine nine-millimeter caliber rounds. Aleman stated that the rounds were "kind of dusty and powdery" and that the box that contained the ammunition appeared undisturbed.

Various "swabbings" were performed throughout the investigation in an attempt to identify gunpowder residue on either Garza or his Jeep. Gunpowder swabbings of Garza's hands were taken at approximately 9:15 p.m. on January 21, after Garza was taken into custody. Investigator Cantu stated that the Department of Public Safety, the agency that analyzes swabbings to determine the presence of gunpowder residue, initially decided not to test the swabbings of Garza's hands because the swabbings were not collected within four hours of the shooting. However, at Investigator Cantu's insistence, the swabbings were analyzed. The results of the swabbings came back negative. Investigator Cantu testified that gunpowder residue "can be removed by simply washing your hands" and that during the investigation, he received information that Garza had showered before being taken into custody. Swabbings from Garza's Jeep's steering wheel were also taken and tested; the results were negative. Crime scene specialist, Oscar Gonzalez Jr., testified that no four-hour window for gunpowder residue collection on clothing exists; however, the clothing that Garza was believed to have been wearing at the time of Macias's shooting was not tested.

After presenting the above evidence, the State rested. The defense rested without

8

presenting any witnesses and moved for a directed verdict. The trial court denied Garza's motion for a directed verdict, and the jury found Garza guilty of first-degree murder. *See id.* Garza was sentenced to eighty years' imprisonment. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Garza contends that the evidence is legally and factually insufficient to support the jury's verdict. In his third issue, Garza argues that the trial court erred in denying his motion for a directed verdict. Because a motion for a directed verdict is a challenge to the legal sufficiency of the evidence, we address these issues together. *See Perales v. State*, 117 S.W.3d 434, 443 (Tex. App.–Corpus Christi 2003, pet. ref'd) ("A challenge to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence.") (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)).

### A. Standard of Review and Applicable Law

The Court of Criminal Appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *8, *14 (Tex. Crim. App. Oct. 6, 2010) (plurality opinion). Accordingly, we review all of Garza's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review. *Id.* at *11.

Under the *Jackson* standard, "the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 2010 WL 3894613, at *5 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt."). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979) ("The jury, in all cases, is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that Garza (1) intentionally or knowingly (2) caused Macias's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (Vernon 2003). "A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Intent may "be

inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may be inferred from the surrounding circumstances).

## B. Analysis

Garza's sufficiency arguments focus on the lack of physical evidence linking him to Macias's shooting. Specifically, Garza contends that the evidence is insufficient to support the jury's verdict because: (1) a gun linking Garza to the commission of the present offense was never located; (2) no gunshot residue was found on Garza's person or his Jeep's steering wheel; (3) the .38 caliber rounds found in Garza's mother's home were old and appeared undisturbed; and (4) clothes recovered from Garza's home were not tested for gunshot residue. Garza also points out that none of the witnesses testified that they actually saw Garza shoot Macias.

The State is not required to present direct evidence to establish guilt. *See Guevara*, 152 S.W.3d at 49. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see*

11

*Guevara*, 152 S.W.3d at 49.

Johnston testified that as he and Macias pulled into the Cardinal Express parking lot, he noticed Garza staring at him. Macias told Johnston that Garza went by the nickname "Cat." Soon after stepping out of his vehicle and into the store's doorway, Johnston heard Macias say, "hey, Cat," and then he heard a gunshot. Johnston stated that when he turned around he saw Macias "run to the front" of the Dodge and lean on its hood then grab his chest and fall to the ground. Johnston testified that he then saw Garza standing in the parking lot near a green Jeep holding a .38 caliber automatic handgun or a revolver.

Diaz and Saenz testified that Garza purchased a beer from the store's drive-through window shortly before they heard a loud noise in the parking lot. Diaz looked outside and saw Macias "take a couple of steps" and fall in front of Johnston's Dodge. Moments after the shooting, Diaz, Saenz, Johnston, Bernal, and Guerrero saw a green Jeep drive out of the Cardinal Express parking lot. The license plate recorded by Bernal matched the license plate on Garza's Jeep, and the other witnesses testified that the green Jeep belonged to Garza.

It is within the province of the jury to determine the credibility of the witnesses and the weight to be accorded to their testimony. *See Jackson*, 443 U.S. at 318-19; *Wesbrook*, 29 S.W.3d at 111. Although no witness testified that he actually saw Garza pull the trigger of a gun and shoot Macias, the jury heard testimony that immediately after Macias was shot, Garza was the only person standing nearby holding a gun. Besides Johnston's Dodge, Macias's Jeep was the only vehicle in the parking lot at the time of the shooting. Moreover, none of the witnesses testified that anyone besides Macias, Garza, and possibly

12

Johnston were in the parking lot at the time of shooting. Additionally, several witnesses testified that they saw Garza leave Cardinal Express immediately after Macias was shot. Garza's flight from Cardinal Express constitutes an additional piece of circumstantial evidence from which the jury could infer guilt. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing that "a fact[-]finder may draw an inference of guilt from the circumstance of flight") (citing *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983); *Jones v. State*, 481 S.W.2d 900, 902 (Tex. Crim. App. 1972)). While we agree that there is no "physical evidence" linking Garza to the crime, the circumstantial evidence in this case is strong enough to support Garza's conviction. *See Hooper*, 214 S.W.3d at 16 (noting that juries are permitted to draw reasonable inferences from circumstantial evidence).

Viewing all of the evidence in the light most favorable to the prosecution, we conclude that a rational juror could have found beyond a reasonable doubt that Garza was guilty of murder. *See Jackson*, 443 U.S. at 319; *Brooks*, 2010 WL 3894613, at *5; *see also* TEX. PENAL CODE ANN. § 19.02(b)(1). Accordingly, we overrule Garza's three issues on appeal.

## IV. CONCLUSION

Having overruled all of Garza's issues, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Publish. TEX. R. APP. P. 47.2(b)

Delivered and filed the 9th
day of December, 2010.