

# NUMBER 13-21-00382-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**RUSSELL ERIC LOFLAND,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                    **Appellee.**

---

### On appeal from the 36th District Court
### of San Patricio County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Chief Justice Contreras**

A jury convicted appellant Russell Eric Lofland of aggravated robbery, a first-degree felony, and sentenced him to twenty-five years' imprisonment in the Correctional Institutions Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. §§ 12.32, 29.03(a), (b). By his sole issue, appellant contends that the evidence was

legally insufficient to support his conviction. We affirm.

## I.   BACKGROUND

A grand jury indicted appellant on December 12, 2017. The indictment alleged that "on or about the 22nd day of February, 2015, . . . while in the course of committing theft of property and with intent to obtain or maintain control of said property," appellant "intentionally or knowingly cause[d] serious bodily injury to Elvin Young [Jr.] by striking and hitting . . . Young in the face and head with the [appellant's] hands and feet or [an] object unknown by the grand jury." On October 5, 2021, appellant pleaded not guilty, and trial commenced. We summarize the testimony relevant to the disposition of this appeal.

### A.     Merry Spriggs Moreno's Testimony

Merry Spriggs Moreno, Young's sister, testified that Young was a fifty-year-old man, about five feet tall, who had suffered from various disabilities throughout his life. According to Moreno, Young also had a drinking problem and lived at home with his and Moreno's mother, Lucille Spriggs. Spriggs, Moreno noted, was displeased with Young's drinking habit, so, on occasion, Young would rent a room at the nearby Cedar Lodge Motel to "hang out with his drinking buddies, and just have a good time." Moreno last saw her brother on February 21, 2015, at Spriggs's house just as Young was preparing to head to the Cedar Lodge in his red Ford Mustang. Moreno was not familiar with appellant and did not believe Young knew him prior to that excursion to the Cedar Lodge.

Moreno testified that her brother "loved jewelry." The State offered photographs as Exhibits 2–6 depicting various pieces of jewelry, which Moreno confirmed belonged to her brother. The jewelry included: (1) two rope chains, one of which was missing a fish

2

pendant that usually adorned Young's neck; (2) a few rings; and (3) a shrimp-shaped charm. Moreno stated that the chains' clasps appear broken in the photos. The State also offered Exhibit 7 depicting a blood-covered fish pendant, which Moreno identified as the one missing from Young's chain.

## B.    Officer Derrell Harvill's Testimony

In 2015, Officer Derrell Harvill was a patrol officer with the Aransas Pass Police Department (APPD). On February 22, 2015, at about 3:00 a.m., Officer Harvill was dispatched to the Cedar Lodge for a welfare check on Young, called in by Spriggs.[1] Officer Harvill testified that he arrived at the Cedar Lodge and parked behind a red Mustang which had its engine running and "its lights on, with the doors open." Two people, later identified as appellant and his fiancé, Angel Kerns, were "loading stuff in[to] the Mustang," which was parked outside their motel room, room 16. Officer Harvill stated that he went straight to room 21, situated about twenty or thirty feet to the left of room 16, where Young was staying. Officer Harvill knocked on the door but received no answer. He attempted to enter the room, but the door was locked. Officer Harvill noticed "a lot of blood everywhere," including on the porch, deck chair, ground, and exterior wall outside of Young's room, and he testified that the blood looked fresh. Officer Harvill's body camera footage was admitted into evidence and played for the jury; it showed the bloody scene and another officer volunteering to go obtain the master key to enter Young's room.

When the officers finally opened the door to room 21, they found Young next to the bed lying face down. Officer Harvill checked for a pulse and found none. He asked his

---

[1] It is not clear from the record what prompted Spriggs to call to request the welfare check.

3

supervisor whether he should move Young to render aid, as Young's body felt warm. The officers called for emergency medical services (EMS). EMS arrived, flipped Young's body, and attempted to resuscitate him, to no avail. Photos of Young were admitted at trial. Officer Harvill testified that Young's face and head were bloodied.

At some point after finding Young's body, Officer Harvill approached appellant and Kerns and started asking them questions. Officer Harvill testified that the couple told him they helped Young into Young's motel room. At points of Officer Harvill's body camera footage, appellant can be heard stating he and Kerns found Young passed out on his porch and helped him into his room from there. At other points, appellant suggested that Young "pulled up here and said get me in the house," so appellant obliged. Officer Harvill testified that he observed no blood trail between appellant's room and Young's, nor any blood in the red Mustang, which was determined to be Young's vehicle. He agreed that the Mustang was parked in front of appellant's room even though there were available parking spots in front of Young's room. Officer Harvill noticed that appellant had blood on his arm, which appellant attributed to his lip. According to Officer Harvill, appellant's lip looked "[s]wollen like he [had] been in a fight." Given the circumstances, including appellant being "the last person to see [Young] alive," Officer Harvill detained appellant and later transported him to the police station for further questioning.

Officer Harvill testified that during booking, appellant emptied his pockets, and the pockets' contents included several blood-covered pieces of jewelry, which Officer Harvill photographed and collected as evidence. Those photographs were admitted at trial as Exhibits 2–6. Moreno confirmed that the jewelry depicted in those exhibits belonged to

4

Young.

## C.    Sergeant Antonio Davila's Testimony

Antonio Davila is a sergeant in APPD. On February 22, 2015, Sergeant Davila was the on-call detective. Sergeant Davila testified that he received a call at about 4:00 a.m. that his services were required at the Cedar Lodge. Sergeant Davila arrived at the scene as EMS was leaving. He noted that Young's face looked like it had been hit with something. He and another APPD detective, Frank Kent, photographed the scene and "collect[ed] blood samples from all the areas that [they] had observed where there was blood at." Along with the blood samples, Sergeant Davila noticed and collected a gold, blood-covered fish pendant on the porch outside of Young's motel room. A picture of the pendant was admitted at trial as Exhibit 7, and Moreno confirmed that the pendant depicted was Young's. Sergeant Davila also collected Young's clothing and secured Young's Mustang.

In the Mustang, Sergeant Davila noticed some men's and women's clothing in the back seat and a large glass bottle of Jack Daniels whiskey on the floor of the front passenger side. Sergeant Davila was informed that appellant and Kerns claimed the clothing as their own and told Officer Harvill when he arrived on the scene at about 3:00 a.m. that they were using the car to go to the laundromat. Sergeant Davila had the Mustang towed back to the police station. There, he searched the vehicle and noticed the Jack Daniels bottle had blood on "the main part of the body and on the neck part of" the bottle. Save for the blood on the bottle, though, Sergeant Davila found no other blood in the Mustang.

5

Later on February 22, detectives Davila and Kent returned to the Cedar Lodge. While there, they found the keys to Young's room located in the grass outside the porch area of room 21, which was notable because Young's door was locked when Officer Harvill arrived to conduct the welfare check. The detectives were also approached by the motel owner, Robert Oxley, who told them that he went into appellant's room and saw "one of the coverings to the window [A/C] unit was removed." He went to check the A/C unit and "noticed a dark colored [object which] look[ed] like [a] wallet stuffed in between the A[/]C unit and where the housing was located." Oxley pointed it out to the detectives, who then collected the wallet. Contained within the wallet was Young's driver's license. Sergeant Davila also collected a bloody towel from appellant's room.

Sergeant Davila testified that the medical examiner's office called the next day to inform him that Young's autopsy was completed. Sergeant Davila went to the medical examiner's office to collect Young's personal belongings and various DNA swabs and fingernail clippings that had been taken during Young's autopsy. Sergeant Davila stated that he transported the evidence to the APPD station and turned it over to the evidence technician. Sergeant Davila also collected appellant's jeans and polo shirt from the previous night for DNA analysis.

D.    **Samantha Perkins's Testimony**

In 2015, Samantha Perkins was the DNA supervisor and technical leader at the Corpus Christi Crime Lab. Perkins testified that she tested various pieces of evidence for DNA profiles. Perkins stated that the DNA profile collected from the blood on the jewelry was consistent with Young's. She noted that she tested DNA from two blood spots on

6

appellant's shirt, one of which was consistent with Young's DNA, the other of which was consistent with both Young's and appellant's DNA. Perkins also tested two blood spots from appellant's jeans. A spot on one of the legs was consistent with Young's DNA, and a spot tested from appellant's front left pocket was consistent with both appellant's and Young's DNA. Perkins tested ten fingernail clippings from Young, all of which were consistent with only Young's DNA, except one—"the right first digit fingernail[] DNA profile was . . . a mixture" of appellant's and Young's DNA. The bloody towel in appellant's room was consistent with appellant's DNA. Finally, Perkins described that DNA tested from a "red stain" on the Jack Daniels bottle found in Young's car was consistent with Young's, and DNA from the bottle cap and neck of the bottle were consistent with a mixture of appellant's and Kerns's.

### E.    Dr. Adel Shaker's Testimony

In 2015, Adel Shaker, M.D., was the Nueces County Medical Examiner. He testified that he conducted Young's autopsy on February 23, 2015. During his examination of Young, Dr. Shaker found an "H shape laceration in [Young's] midfrontal scalp" and that Young's septum was fractured. Dr. Shaker stated that below the laceration was a deep hematoma, indicative of "strong blunt force trauma." Blunt force trauma, Dr. Shaker explained, could be caused by an object or a punch or kick. Dr. Shaker testified that Young was not a healthy person—he had high blood pressure, heart disease, and a heavy heart.

On cross-examination, Dr. Shaker noted that Young's blood alcohol content (BAC) at the time of his examination was 0.292%. He testified that BAC was itself potentially life-

threatening. He also informed the jury that Young was on blood pressure medication and anxiolytics, which should not be mixed with alcohol. Dr. Shaker's autopsy report was admitted into evidence and shows a presumed cause of death as "[c]ombined drug toxicity." The manner of death was listed as "undetermined." On re-direct examination, the State asked Dr. Shaker whether, given Young's health condition, "the trauma [Young] suffered played a role in his demise?" Dr. Shaker answered affirmatively, suggesting that tachycardia, or an accelerated heart rate, associated with a fight can cause ventricle fibrillation, "which is a final stage [in] stopping the heart." The State then rested its case.

## F. Angel Kerns's Testimony

Kerns testified for the defense. She stated she and appellant met Young on February 21, 2015. The three spent the afternoon drinking. At some point, they ran out of alcohol and went to buy more. They returned to the Cedar Lodge and continued drinking. According to Kerns, she and appellant left around 7:00 or 8:00 p.m. to go to a bar. When the couple returned between 2:00 and 3:00 a.m., they saw Young face-down outside of his room with the door ajar. They exchanged no words with Young and did not call EMS because they only thought Young was passed out from drinking. Kerns testified that she and appellant placed Young in his room and then retired to their room. She noted that soon thereafter, the police knocked on her and appellant's door to arrest them.

On cross-examination, Kerns testified that she was in the red Mustang when the police arrived because she and appellant were heading out to do laundry.

The defense rested. The jury convicted appellant of aggravated robbery and sentenced him to twenty-five years' incarceration. This appeal followed.

8

## II.     SUFFICIENCY OF THE EVIDENCE

By his sole issue, appellant argues that the evidence was legally insufficient to support his conviction for aggravated robbery "in that the evidence supporting the finding an assault or theft took place . . . and the evidence that an assault was committed with the intent of facilitating a theft is so weak that the verdict seems clearly wrong and manifestly unjust."

## A.     Standard of Review & Applicable Law

"In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence 'in the light most favorable to the verdict' to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Delagarza v. State*, 635 S.W.3d 716, 723 (Tex. App.—Corpus Christi–Edinburg 2021, pet. ref'd) (quoting *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony." *Delagarza*, 635 S.W.3d at 723 (first citing *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020); and then citing TEX. CODE CRIM. PROC. ANN. art. 38.04).

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct

jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

A hypothetically correct charge would instruct the jury that a person commits the offense of robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 29.02(a)(1). "A person commits an offense [of theft] if he unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a). The offense of robbery becomes an aggravated robbery if, among other things, the person "causes serious bodily injury to another." *Id.* § 29.03(a)(1). "'Serious bodily injury' means," among other things, "bodily injury that creates a substantial risk of death or that causes death." *Id.* § 1.07(a)(46).

"A person acts . . . with intent[] with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). A jury may infer a defendant's knowledge or intent from direct or circumstantial evidence, including the accused's acts, words, and conduct. *Garza v. State*, 398 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2010, pet. ref'd).

10

**B.      Analysis**

Appellant argues that there was legally insufficient evidence (1) that he committed theft, (2) that he committed an assault, and (3) "to prove a nexus between an assault and theft." We disagree.

As to evidence of theft, after being transported to the APPD station, appellant was asked to empty his pockets. Contained within his pockets were blood-covered pieces of jewelry. Perkins testified that the DNA from the blood matched Young's. Moreno testified that Young "loved jewelry" and described the pieces he was wearing when she last saw him. When shown Exhibits 2–6, Moreno confirmed the jewelry collected from appellant at the APPD station belonged to her brother. Moreno stated, and Exhibits 4–6 confirm, that the clasp to at least one of Young's chains was broken. Moreover, Young's wallet was found in the A/C unit in appellant's motel room. And Officer Harvill testified that, when he arrived at the Cedar Lodge, appellant and Kerns were loading personal belongings into Young's Mustang, which was running and parked in front of appellant's, rather than Young's room. This evidence sufficed to prove that property was appropriated from Young. *See* TEX. PENAL CODE ANN. § 31.03(a). The jury was free to infer, among other things, that the presence of blood on the jewelry, the chain's broken clasp, appellant's possession of the jewelry, Young's wallet hidden in appellant's room, and appellant's loading up and using Young's Mustang proved that appropriation was intended and unlawful. *See id.*; *Garza*, 398 S.W.3d at 744. Indeed, Kerns testified that Young was non-responsive and she and appellant exchanged no words with Young when moving him into his room, and yet Young's bloody jewelry, wallet, and car ended up in appellant's

11

possession with no indication that Young willingly provided appellant with the same. And there was no explanation given by appellant for his possession of the jewelry. *See Hardesty v. State*, 656 S.W.2d 73, 77 (Tex. Crim. App. 1983) (providing that recent and unexplained possession of property supports an inference of guilt).

There is also sufficient evidence to prove appellant caused Young to suffer serious bodily injury.[2] *See* TEX. PENAL CODE ANN. § 29.03(a)(1); *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity . . . by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."). Officer Harvill testified that there was a significant amount of blood right outside of Young's motel room door. Sergeant Davila testified that Young looked as though he was hit in his face, and photographs of Young corroborate that testimony. Dr. Shaker testified that Young had a fractured septum, a laceration on his forehead, and a deep hematoma underneath it, indicative of significant blunt force trauma. While he testified that Young's cause of death was combined drug toxicity, Dr. Shaker agreed that, given the condition of Young's health, "the trauma [Young] suffered played a role in his demise." Perkins testified that (1) blood found on appellant's polo shirt and jeans was positive for both appellant's and Young's DNA, (2) appellant's DNA was found under one of Young's fingernails, and (3) Young's blood was found on the Jack Daniels bottle that was in the car. Sergeant Davila testified there was no other blood found in the Mustang. Further, Officer Harvill testified that appellant's lip looked swollen, as though he had been

---

[2] We note that appellant focuses his argument on the lack of sufficient evidence that he perpetrated an assault on Young, not that Young suffered serious bodily injury.

12

in a fight. And Perkins testified that blood from a towel found in appellant's motel room came back as belonging to appellant. *See Jones v. State*, 458 S.W.3d 625, 632 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (concluding that evidence of victim's and appellant's DNA on discarded clothing near scene of crime, along with reasonable inferences from that evidence, sufficed to prove appellant was attacker). Given this evidence, a reasonable juror could have inferred that appellant and Young engaged in a fight near room 21, and appellant struck Young with his hands, feet, a Jack Daniels bottle, or another object that caused Young to suffer serious bodily injury. *See id.*; *Delagarza*, 635 S.W.3d at 723; *Garza*, 398 S.W.3d at 744.

Appellant argues that Kerns's testimony that she and appellant found Young lying on the porch outside of his motel room "impl[ies] that she and [a]ppellant found . . . Young after the injuries to his forehead had occurred." But the jury is the sole "judge of the facts, the credibility of the witnesses, and the weight to give their testimony." *Delagarza*, 635 S.W.3d at 723. Here, the jury was free to disregard all or parts of Kerns's testimony as incredible. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony."). Notably, Kerns testified that when they found Young, she and appellant did not call for emergency services because they thought Young was merely passed out from being drunk. But the blood all over room 21's porch and Young's face suggests otherwise and challenges any supposed implication that Young was found only after suffering injuries. Moreover, Officer Harvill's body camera footage shows appellant making inconsistent statements as to how he came to purportedly help Young into room 21. In

13

one rendition, appellant and Kerns came back from a bar, found Young lying face down on his porch, and helped him into his room. Later, however, appellant stated that Young "pulled up here and said get me in the house," so appellant obliged. Even if appellant was consistent in his statements, the jury was free to believe or disbelieve them, and the evidence was otherwise sufficient to prove appellant was Young's attacker. *See* TEX. PENAL CODE ANN. § 29.02(a)(1); *Febus*, 542 S.W.3d at 572; *Delagarza*, 635 S.W.3d at 723.

Finally, appellant contends that "[e]ven assuming the evidence is sufficient to prove [a]ppellant committed an assault and a theft, to be convicted of robbery, the State must prove a nexus between an assault and the theft." Appellant argues that there is insufficient "evidence that appellant formed the requisite intent to steal Young's jewelry or vehicle either before or during the commission of the assault." Instead, he suggests that, at best, "[a] rational trier of fact could conclude that picking up the jewelry was an afterthought following a fight between two intoxicated persons over some disagreement."

As noted, a person commits robbery if "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 29.02(a)(1). The penal code defines "[i]n the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1). To support his argument that a nexus between an assault and theft must exist to sustain a conviction, appellant cites *Cooper v. State*, 67 S.W.3d 221, 223 (Tex. Crim. App. 2002). Apart from reciting the general nexus

14

requirement between an assault and theft, however, *Cooper* stands for the rule "that a theft occurring immediately after an assault will support an inference that the assault was intended to facilitate the theft" for purposes of proving robbery. *Id.* at 224; *see Walter v. State*, 581 S.W.3d 957, 974 (Tex. App.—Eastland 2019, pet. ref'd) (noting that the nexus requirement "may be inferred when both offenses [an assault and theft] occur in close temporal proximity"). And that "inference will not be negated by evidence of an alternative motive that the jury could rationally disregard." *Cooper*, 67 S.W.3d at 224. That is because "[t]he appellant's motive in committing the assault . . . may be probative of the nexus element, but it is not itself an element of the offense of robbery." *Sorrells v. State*, 343 S.W.3d 152, 158 (Tex. Crim. App. 2011). The relevant question is whether the assault took place "in the course of committing theft," not whether the theft was appellant's motive for the assault. *See id.*

In *Cooper*, appellant was a recent parolee who was living with his uncle, E.W. *Cooper*, 67 S.W.3d at 222. One morning, E.W. took appellant "to help him work on a fence." *Id.* "As [E.W.] was about to put a fence post into the ground, appellant struck him from behind without any warning. A struggle followed and both men fell to the ground." *Id.* When E.W. "released his grip on appellant, appellant stood up, walked to [E.W.]'s truck, got into it, and drove away." *Id.* Appellant was found about an hour later in a nearby town trying to fix the truck, which had broken down. *Id.* The Beaumont court of appeals held that those facts did not suffice to prove the nexus element of aggravated robbery. The court of criminal appeals disagreed, noting that the jury could have rationally disbelieved appellant's testimony that "at the time of the attack, he was hearing voices,"

15

"thought his uncle was hitting a child," "didn't know what [he] was doing," and "just ran and jumped in the truck and just took off," and the evidence was otherwise sufficient to support a conclusion that the assault was committed in the course of the commission of the theft of E.W.'s truck. *Id.* at 224.

In *Sorrells*, Reynolds was waiting outside a nightclub for her boyfriend, Rice, to retrieve their vehicle. *Sorrells*, 343 S.W.3d at 153. While waiting, Reynolds leaned up against a parked Mercedes SUV. *Id.* Appellant exited the club, told Reynolds to "get the f*** off the car," and pistol whipped her; a scuffle ensued. *Id.* At some point, Rice arrived and joined the fray, and appellant aimed his gun at Rice. *Id.* Rice punched appellant, the two started fighting, and then a third person came over and punched Rice. *Id.* Reynolds left to seek help. *Id.* When she returned, the fight had ended, and Rice told her that his lion medallion necklace had been stolen. *Id.* Rice's friend, Fritz, testified that he saw Rice getting attacked, joined the fight, and he too got hit across the head with a pistol. *Id.* at 154. Sometime during the fight, he saw Rice's medallion on the ground. *Id.* Officer Riley testified that he arrived at the scene and, within minutes, found three suspects walking down the alley behind the club. *Id.* One of the suspects had Rice's lion medallion in his coat pocket. *Id.* This Court held that there was insufficient evidence proving a nexus between appellant's assault and the theft of the medallion because appellant's motive was evidently to keep Reynolds off his SUV and Rice from interfering. The Texas Court of Criminal Appeals disagreed and reversed our decision, holding that:

> Based on Rice's testimony that the necklace was missing immediately after the assault, and Fritz's testimony that he saw the necklace on the ground during the course of the assault, a rational juror could draw a reasonable inference that the assault and the theft occurred simultaneously, and thus

16

the assault was committed during the commission of theft.

*Id.* at 158.

Here, even assuming appellant had no motive or intent to steal any of Young's property before or during the assault as appellant suggests, there is sufficient evidence that appellant caused Young's serious bodily injury "in the course of committing theft." *See* TEX. PENAL CODE ANN. §§ 29.01(1); 29.02(a)(1); *Sorrells*, 343 S.W.3d at 157; *Cooper*, 67 S.W.3d at 224. First, Officer Harvill arrived at the Cedar Lodge at about 3:00 a.m. on February 22, 2015, and noted that Young's body was "still warm," as though he was only recently deceased. Officer Harvill also stated that the blood outside of Young's room looked fresh. Kerns testified that she and appellant returned to the Cedar Lodge from a bar between 2:00 and 3:00 a.m. when they saw Young passed out on his porch and helped him into his room. Within the next hour or so, appellant was found with Young's jewelry and loading up Young's Mustang, purportedly to go do laundry at 3:00 a.m. The jewelry was covered in Young's blood and at least one of the chains' clasps was broken as though it had been yanked from Young's neck. The fish pendant found on the porch bolsters that prospect. Young's wallet was tucked away inside the A/C unit in appellant's motel room. And Young's car was parked and running outside of appellant's room being loaded up for departure. We conclude that a rational juror could draw reasonable inferences from this evidence that the assault of Young was committed in the course of committing theft. *See id.*; *Walter*, 581 S.W.3d at 974; *see also Razor v. State*, No. 03-13-00568-CR, 2015 WL 3857293, at *3 (Tex. App.—Austin June 17, 2015, no pet.) (mem. op., not designated for publication) (concluding that evidence was sufficient to prove the nexus requirement between an assault and theft where, following a rendezvous with

17

appellant, a prostitute was hit in the back of her head in an isolated alley and knocked unconscious, she knew appellant was behind her when she was hit, she woke up with a bloody head with all her belongings missing, and appellant's DNA was found on her body); *Abdullah v. State*, No. 06-13-00257-CR, 2014 WL 6450482, at *1 (Tex. App.—Texarkana Nov. 18, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence was sufficient to prove the nexus requirement between the assault and theft where mother and daughter were assaulted while entering their home, and mother noticed when police arrived soon after that her wallet was missing from her unlocked car in the driveway).

In sum, viewing the evidence in a light favorable to the jury's verdict, we conclude that a rational juror could have found the essential elements of the crime of aggravated robbery beyond a reasonable doubt. *See Delagarza*, 635 S.W.3d at 723; *Stahmann*, 602 S.W.3d at 577. We overrule appellant's sole issue.

### III.   CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
23rd day of February, 2023.

18